# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| RAYMOND E. KING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 10 C 6838 |
| | ) | |
| PARTHASARATHI GHOSH, M.D., RONALD | ) | Judge John Z. Lee |
| SCHAEFER, M.D., LIPING ZHANG, M.D., | ) | |
| CATALINO BAUTISTA, M.D., ARTHUR A. | ) | |
| FUNK, M.D., JOSEPH SHEEHY, SANDIE | ) | |
| THOMAS, HUNDLEY A. DAVIS, M.D., | ) | |
| SALEH OBAISI, M.D., IMHOTEP CARTER, | ) | |
| M.D., SHANNIS STOCK, S.A. GODINEZ, and | ) | |
| WEXFORD HEALTH SOURCE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Raymond King, an inmate at Stateville Correctional Center ("Stateville"), has been afflicted with a panoply of health ailments; a hernia and a bad knee are the subjects of this lawsuit. King has sued various physicians and medical technicians at Stateville, as well as Illinois Department of Corrections ("IDOC") officials and Wexford Health Sources, Inc. ("Wexford"), for deliberate indifference to his serious medical needs in violation of the Eighth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983. Defendants have filed summary judgment motions. For the following reasons, the motions are granted in part and denied in part.

## I. Northern District of Illinois Local Rule 56.1

Northern District of Illinois Local Rule 56.1 requires that "[a]ll material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." LR 56.1(b)(3); *see Smith v. Lamz*, 321 F.3d 680, 683 (7th

Cir. 2003) ("We have consistently held that a failure to respond by the nonmovant as mandated by the local rules results in an admission.").

For the most part, King complied with Local Rule 56.1 when responding to the statements of fact filed by the various doctors and Wexford entities. With regard to the IDOC Defendants, however, King did not respond to their statement of facts, did not file a statement of additional facts in support of his claims against them, and did not reply to their memorandum of law in support of their summary judgment motion. Accordingly, the Court deems admitted all properly supported assertions in the IDOC Defendants' statement of fact. *See, e.g.*, *Friend v. Valley View Cmty. Unit Sch. Dist. 365U*, 789 F.3d 707, 710 (7th Cir. 2015) (holding that district court did not abuse its discretion by deeming admitted movant's facts due to nonmovant's failure to comply Local Rule 56.1), *cert. denied*, 137 S. Ct. 141 (2016). A nonmovant's failure to comply with Local Rule 56.1 does not automatically result in a judgment for the movant. *See Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006). Rather, the "ultimate burden of persuasion remains with [the movant] to show that it is entitled to judgment as a matter of law." *Id.*

## II. Factual Background[1]

The following facts are undisputed, unless otherwise noted. At all times relevant to this lawsuit, King has been incarcerated at Stateville and in the custody of the IDOC. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶¶ 1, 17.

---

[1]    King argues in his response brief that gaps in his medical records for reasons outside of his control should not create any adverse inferences against him. *See* Pl.'s Resp. Br. at 12. In ruling on the summary judgment motions, the Court has relied on the cited portions of King's deposition as well as medical records, and there has been no occasion for the Court to make such inferences. Accordingly the parties' arguments regarding this issue are moot.

In filing their summary judgment motions, Defendants have categorized themselves into three groups: the IDOC Defendants, the Doctor Defendants, and the Wexford Defendants. The members of those groups are as follows.

The IDOC Defendants include Joe Sheehy and Sandie Thompson,[2] medical technicians who are sued in both their individual and official capacities. Also included are Shannis Stock, IDOC Chief of Programs and Support Services, and Salvador Godinez, IDOC's Director. Both are sued only in their official capacity. IDOC Defs.' LR 56.1(a)(3) Stmt. ¶¶ 2–5.

The Doctor Defendants include Dr. Arthur Funk, Dr. Ronald Schaefer, Dr. Liping Zhang, Dr. Catalino Bautista, Dr. Imhotep Carter, Dr. Saleh Obaisi, and Dr. Ann Davis. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 36 (Dr. Funk); *id.* ¶ 27 (Dr. Schaefer); *id.* ¶¶ 21–22 (Dr. Zhang); *id.* ¶ 37 (Dr. Bautista); *id.* ¶¶ 39, 42 (Dr. Carter); *id.* ¶¶ 45–51, 59, 61, 63–64, 67–70, 78 (Dr. Obaisi); *id.* ¶¶ 58, 62 (Dr. Davis). Dr. Funk served as the Regional Medical Director of Wexford from 2005 to present and filled in as a physician on an as-needed basis. *Id.* ¶ 5. Dr. Zhang was a staff physician from 2006 to 2010. *Id.* ¶ 2. Dr. Schaefer served as Medical Director and filled in as a physician on an as-needed basis in 2010. *Id.* ¶ 3. Dr. Bautista was a physician and Interim Medical Director from May 31 to July 24, 2011. *Id.* ¶ 35. Dr. Carter was Medical Director from July 25, 2011, to May 13, 2012. *Id.* ¶ 38. Dr. Obaisi served as a physician and Medical Director from August 2, 2012, to present. *Id.* ¶ 7. Last, Dr. Davis was a staff physician from 2013 to 2014. *Id.* ¶ 8. Each Doctor Defendant is sued in his or her individual and official capacities. 4th Am. Compl. ¶¶ 7–10, 13–15.

The Wexford Defendants include Wexford, a corporation that has contracted with IDOC to provide medical services to inmates at Stateville. Wexford Defs.' LR56.1(a)(3) Stmt. ¶¶ 53–54.

---

[2]     Sandie Thompson is variably misnamed on the docket and in Fourth Amended Complaint as both "Sandy Thomas" and "Sandie Thomas."

Also included is Dr. Parthasarathi Ghosh, who is sued in his individual and official capacity. *Id.* ¶ 6. Dr. Ghosh treated King's conditions and also served as Stateville's Medical Director from June 2003 to March 2011. Wexford Defs.' LR 56.1(a)(3) Stmt. ¶¶ 7, 17, 39–40; Wexford Defs.' Ex. B, Ghosh Dep. of 10/20/15, at 7:22–24; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 7, 40.

### A. King's Inguinal Hernia Condition

#### 1. Injury, Diagnoses, and Treatment

While at Stateville, King first visited the health care unit for his hernia on March 22, 2006. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 2; Doctor Defs.' Reply Ex. 1. During his second visit on January 18, 2008, King was examined by LaTonya Williams, a physician's assistant, who is not a Defendant. *Id.* ¶ 3. King reported having burning pain in his testicle due to a four-year-old hernia. *Id.* (citing Pl.'s Ex. Q, 1/18/08 Records); Doctor Defs.' Reply Ex. 2. Williams noted that the hernia "can't be reduced,"[3] and it is disputed whether that notation is based on her own conclusion upon examination or King's description. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 3; Doctor Defs.' Reply Ex. 2. Nonetheless, Williams referred King to Stateville's "ER for evaluation." Doctor Defs.' Reply Ex. 2.

As a result of that referral, that same day, King was examined by Dr. Aguinaldo (another person who had not been named in this lawsuit), who diagnosed King with a right inguinal hernia. Pl.'s Dep. Pt. 3, at 55;[4] Pl.'s Ex. Q. Dr. Aguinaldo told King that his hernia was non-reducible

---

[3]     A brief primer on hernias is required. A reducible hernia is one that can be pushed back inside the body by applying pressure. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 13. A non-reducible or incarcerated hernia is one that cannot be pushed back into the body. *Id.* A strangulated hernia is one that cannot be reduced and lacks adequate blood flow to the tissue that is incarcerated within the hernia sac. *Id.* Either a non-reducible or a strangulated hernia requires surgical intervention. Wexford Defs.' LR 56.1(a)(3) Stmt. ¶ 48.

[4]     King was deposed three times, but none of the transcripts are consecutively paginated. In an attempt at clarity, the Court cites the first deposition taken on June 3, 2015 (Doctor Defendants' Ex. I) as "Pl.'s Dep. Pt. 1." The second deposition, taken on September 14, 2015 (Doctor

and that, pursuant to Stateville's protocol, he would ask Dr. Ghosh, the Medical Director, to refer King to University of Illinois in Chicago Hospital ("UIC") for an evaluation. Pl.'s Dep. Pt. 3, at 55; Pl.'s Ex. Q; *see* Wexford Defs.' LR 56.1(a)(3) Stmt. ¶ 48. Despite Dr. Aguinaldo's diagnosis and concern, King was never referred to UIC for an evaluation in 2008, 2009, or 2010. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 3.

In August 2008 and January 2009, King filed grievances about the failure of medical technicians and doctors to examine or treat his hernia despite King's numerous requests over the five-month period from March to August 2008. *Id.* ¶ 33; Pl.'s Ex. R, 8/20/08 Grievance; Pl.'s Ex. S, 1/7/09 Grievance. King explained that, from March to August 2008, he tried "unsuccessfully to be seen on the sick call." Pl.'s Ex. R, 8/20/08 Grievance. He reported that he could not get his hernia to "go in," that his hernia was "causing [him] a great deal of pain," that his hernia made it "hurt[] to walk and sit down," and that attempts to reduce his hernia made him feel as though he was "about to vomit." Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 34; Pl.'s Ex. S, 1/7/09 Grievance.

The August 2008 grievance mentioned IDOC Defendants Sheehy and Thompson, medical technicians who made rounds in King's housing area. Pl.'s Ex. R, 8/20/08 Grievance; IDOC Defs.' LR 56.1(a)(3) Stmt. ¶¶ 6–9. King complained that, although he had requested on many occasions during the five-month period that Sheehy and Thompson put his name on the sick-call list, he had never been examined. Pl.'s Ex. R, 8/20/08 Grievance. King also alleges that there were times when Sheehy would come to his cell, but refused to examine him. IDOC Defs.' LR 56.1(a)(3) Stmt. ¶ 26. King further alleges that when he asked Thompson to be seen for his hernia, he would tell King "you is a writ, so you going to have to wait until you get back to your institution." Pl.'s Dep. Pt. 3, at 90. Thompson's statement occurred during a seven-month period

---

Defendants' Ex. K) is cited as "Pl.'s Dep. Pt. 2." The third, taken on October 26, 2015 (Doctor Defendants' Ex. L) is cited as "Pl.'s Dep. Pt. 3."

from September 2007 to April 2008, when King had been temporarily transferred—or, in jailhouse slang terms, "writ-ed"—from Menard Correctional Center to Stateville for treatment of a different health condition.  Pl.'s Dep. Pt. 1, at 39–41.

Neither Sheehy nor Thompson has any recollection of any interaction with King.  IDOC Defs.' Ex. G, Sheehy Aff. ¶ 1; IDOC Defs.' Ex. F, Thompson Aff. ¶ 1.  But they generally assert that when medical technicians received a complaint from an inmate, they would take the inmate's vital signs and determine whether the condition was an emergency.  IDOC Defs.' LR 56.1(a)(3) Stmt. ¶ 9.  A condition such as a seizure, chest pain, diabetic shock, difficulty breathing, or an open wound constituted an emergency that warranted immediate medical intervention.  *Id.* Sheehy and Thompson's general practice was to schedule inmates with non-life-threatening medical conditions for an appointment on the "sick call" in the health care unit.  *Id.* ¶ 10; IDOC Defs.' Ex. G, Sheehy Aff. ¶ 4; IDOC Defs.' Ex. F, Thompson Aff. ¶ 4.  Whether an inmate was actually seen on the sick call on any given day, however, depended on the work schedules of the doctors in the health care unit.  IDOC Defs.' LR 56.1(a)(3) Stmt. ¶ 10.

Dr. Zhang examined King on February 14, 2009.  Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 4. According to King, when she attempted to force his hernia into his body, he started "screaming and hollering" due to the pain.  Pl.'s Dep. Pt. 3, at 56.  The record does not show whether Dr. Zhang administered pain medication or ice before attempting to reduce King's hernia.  Dr. Zhang noted in King's medical record that he "refused to cooperate."  Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 22.  Dr. Zhang gave King a support garment called a "hernia belt" designed to keep an inguinal hernia inside the body, but, according to King, because his hernia was already irreducible, it had no effect.  Pl.'s Dep. Pt. 3, at 57.  The parties dispute whether King had already told Dr. Zhang that the prescribed medication had not alleviated his pain.  Pl.'s LR 56.1(b)(3)(B) Stmt. (Doctor

Defs.) ¶ 21; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 24–25, 33, 36, 38. Dr. Zhang did not ask Dr. Ghosh, as Medical Director, to refer King to UIC for an evaluation. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 4.

In February and April of 2010, King filed more grievances stating that, although he had put in numerous requests to be seen by a doctor since January 2009, medical staff refused to address his irreducible hernia, which was "extremely tender to touch." *Id.* ¶ 33; Pl.'s Ex. U, 2/4/10 Grievance; Pl.'s Ex. W, 4/8/10 Grievance.

On April 10, 2010, Dr. Zhang once again tried to reduce King's hernia during an examination. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 24. Again, the record does not show whether Dr. Zhang administered pain medication or ice prior to doing so. While she was pushing on his hernia, King felt excruciating pain to the point of being in tears, and he pushed Dr. Zhang's hand away. Pl.'s Dep. Pt. 3, at 58. Dr. Zhang again noted that King had been uncooperative and refused to allow her to attempt to reduce his hernia. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 24. Dr. Zhang prescribed Toradol for the pain. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 6. Although the parties dispute why, it is undisputed that King never received Toradol as a result of that prescription. Doctor Defs.' Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 6. Furthermore, King states, and Defendants dispute, that none of the prescription pain medication had alleviated his hernia pain. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 24–25, 33, 36–38.

Three days later, on April 13, 2010, Dr. Ghosh examined King's hernia. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 25. Dr. Ghosh states that he categorized King's hernia as "reducible, not incarcerated." *Id.* According to King, however, it would have been impossible for Dr. Ghosh to have known whether the hernia was reducible because Dr. Ghosh did not examine it or try to manually reduce it. Pl.'s LR 56.1(b)(3)(B) Stmt. (Doctor Defs.) ¶ 25.

By August 17, 2010, King states that he was unable to walk due to his hernia pain, and that a correctional officer noticed and sent him to the health care unit to be evaluated. Pl.'s LR

56.1(b)(3)(C) Stmt. ¶ 8; *see* Pl.'s Ex. AA, 8/18/10 Grievance, at 2 (stating he was brought in a wheelchair to the health care unit).[5] Dr. Schaefer told him to pull his pants down, saw the swelling, and told King that he did not have a hernia. Pl.'s Dep. Pt. 3, at 14–15. Dr. Schaefer ordered a scrotal ultrasound, but no ultrasound was ever administered. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 9.

On August 18, 2010, King filed a grievance seeking surgical repair of his hernia, or at the very least, to be seen by Medical Director Dr. Ghosh in order to be referred to a specialist. Pl.'s Ex. AA, 8/18/10 Grievance. He also requested pain medication that would not have the side effect of elevating his blood pressure. *Id.*; Pl.'s Dep. Pt. 3, at 43.

On July 5, 2011, King was examined by Dr. Funk, who wrote "ABD reducible (RT) IH" and "uncomplicated RIH" on King's chart. Doctor Defs.' Ex. M, at 45. According to Dr. Funk, this meant that he observed an uncomplicated, reducible, right inguinal hernia. Doctor Defs.' LR 56.1(a)(3) ¶ 36; Defs.' Ex. E, Funk Decl. ¶ 6. King counters that, at this point, the pain from his irreducible hernia was uncontrolled by prescribed medication. Pl.'s LR 56.1(b)(3)(B) Stmt. (Doctor Defs.) ¶ 36.

Dr. Carter examined King's knee and jaw (for reasons that will be explained) and renewed his low-bunk and low-gallery permits on August 18, 2011. Doctor Defs.' Ex. M, at 66. According to King, he also complained to Dr. Carter about his hernia condition, but Dr. Carter told him that medical staff could address one issue at a time. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. (Doctor Defs.) ¶ 39.

---

[5] Although the Doctor Defendants attempt to deny this fact by stating that Dr. Schaefer's notes from that appointment omit any mention of King's inability to walk, absence of a notation does not refute King's assertion. Also, although the Doctor Defendants state that "Plaintiff refused to answer [Dr. Schaefer's] questions about his symptoms," that statement is unsupported by the cited portion of the record, which states that when asked about his history of hernia pain, King said, "read my chart and you'll see." Doctor Defs.' Ex. M, Medical Records, at 11.

A year later, in August 2012, King's hernia was twice examined by Dr. Obaisi. During the first visit, Dr. Obaisi observed King's hernia and approved King's low-bunk and low-gallery permits. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 45; Doctor Defs.' Ex. M, at 82. During the second visit, King told Dr. Obaisi that the hernia belt prescribed by Dr. Zhang had not helped. Doctor Defs.' Ex. M, at 83. In King's view, Dr. Obaisi appeared jocular and indifferent to King's painful hernia, and when Dr. Obaisi attempted to reduce his hernia, King walked out angrily. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 13; Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 46.

Dr. Obaisi examined King again on September 10, 2012, and he referred him for surgical evaluation of his hernia at UIC. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 47; Doctor Defs.' Ex. M, at 84. King disputes this fact and states that the only person he saw on September 10, 2012, was a supply clerk, who measured him for a hernia truss. Pl.'s LR 56.1(b)(3)(B) Stmt. (Doctor Defs.) ¶ 47.

On September 27, 2012, King was carried on a stretcher to the infirmary. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 14. Dr. Obaisi administered a narcotic pain medicine and applied ice to the area before attempting to reduce the hernia, but he was unable to reduce it. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 49. Dr. Obaisi sent King to Provena St. Joseph Medical Center's ("St. Joseph's") emergency room, and King was admitted to the hospital. *Id.* ¶ 50.

A surgeon at St. Joseph noted that King's blood pressure was extremely high, and he recommended hernia surgery once King's blood pressure was controlled. *Id.* Consequently, King was discharged and sent back to Stateville. *Id.* After King's blood pressure was lowered with hypertension medication, Dr. Obaisi sent King to UIC on October 18, 2012. *Id.* ¶ 52.

King was hospitalized for several days at UIC and underwent hernia repair surgery around October 21, 2012. *Id.*; Pl.'s Dep. Pt. 3, at 68. King returned to his cell at Stateville on that date, and he went to the health care unit only for periodic dressing changes of his surgical wound.

Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 52; Pl.'s Dep. Pt. 3, at 69. King was prescribed a narcotic pain medicine and antibiotics. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 52. He also received a temporary medical permit to receive meals in his cell. *Id.*

On October 24, 2012, King's hernia surgery site showed acute swelling and discharge. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 15. Fearing infection, Dr. Obaisi sent King back to UIC for an evaluation. *Id.*; Doctor Defs.' Ex. M, at 100. The doctor who evaluated King at UIC admitted him into the hospital for treatment. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 15. Although the record does not reflect it, presumably King was eventually released and sent back to Stateville.

### 2. King's Inguinal Hernia Site Post-Surgery

About eight months later, during a medical appointment on July 2, 2013, Dr. Anne Davis examined King after he complained about pain around the surgical site. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 58. Her notes indicate that King was tender in the area of the scar, but there was no recurring hernia and no palpable fascial defect. Doctor Defs.' Ex. M, at 134. She indicated that the pain was muscle-related and prescribed analgesic balm to treat the pain. *Id.*; Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 58. She instructed King to follow up as scheduled with Medical Director Dr. Obaisi. Doctor Defs.' Ex. M, at 134.

Dr. Obaisi noted that King's hernia was "free of swelling and tenderness" and that the surgery site was in "normal condition" during an examination on November 14, 2013. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 59. Nonetheless, because King complained of knee and hernia pain, as well as a condition affecting his mouth called "TMJ," Dr. Obaisi administered an injection of Toradol, a pain medication, and renewed King's pain medicine prescription on March 17, 2014. *Id.* ¶¶ 59, 64. King contends, however, that the medication did not alleviate his pain. Pl.'s LR 56.1(b)(3)(B) Stmt. (Doctor Defs.) ¶ 64.

When King complained about his post-operative pain again on March 17, 2015, Dr. Obaisi prescribed analgesic balm. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 70. King generally asserts that his hernia surgical site has been in constant pain and discomfort, no matter what the doctors have done for him at Stateville. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 16, 36, 38.

**B.      King's Knee Condition**

In June 2006, King injured his right knee while incarcerated at Menard Correctional Center. Doctor Defs.' LR 56.1(a)(3) ¶ 11. When he went to pick up a handball, he experienced pain that "felt like somebody taking a knife and cut[ting] my knee open." Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 19; Pl.'s Reply Ex., Pl.'s Decl. ¶ 19; Pl.'s Dep. Pt. 1, at 37. The knee was x-rayed, but no one ever discussed the x-ray results with King. Pl.'s Dep. Pt. 1, at 39. King was prescribed Tylenol and Ibuprofen. *Id.*

As he had done with regard to his hernia, in August 2008, King filed a grievance regarding Sheehy. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 34; Pl.'s Ex. R, 8/20/08 Grievance. King complained that, from March to August 2008, he had tried "unsuccessfully to be seen on the sick call" for a "problem with [his] right knee." Pl.'s Ex. R, 8/20/08 Grievance.

After King filed that grievance, his knee was examined by Williams, a physician's assistant who is not a defendant here, on September 16, 2008. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 19. King asserts that, at that time, his knee pain had increased and the swelling had extended to his calf. *Id.* ¶ 22. Williams observed that King walked with a slight limp. Doctor Defs.' Ex. M, at 1. She prescribed Indocin, a non-steroidal anti-inflammatory pain medication ("NSAID"), an analgesic balm, and an elastic knee brace. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 19. Williams provided King with a medical permit for the brace, and she ordered an x-ray of his knee. *Id.* The x-ray showed "minimal early degenerative joint disease" but was "[o]therwise negative." Doctor Defs.' Ex. M, at 3.

When Dr. Zhang examined King on October 18, 2008, she noted that his knee had full range of motion and that King was able to bear weight on it. Doctor Defs.' LR 56.1(a)(3) ¶ 21. Dr. Zhang instructed King to continue the course of treatment prescribed by physician's assistant Williams. *Id.* King states that the prescribed pain medication did not alleviate his knee pain. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 37.

King received a new elastic knee brace and brace permit on August 20, 2009, during an examination by Williams. Doctor Defs.' LR 56.1(a)(3) ¶ 23. She prescribed Tramadol, a prescription-strength pain medication, and more analgesic balm. *Id.*

King's knee was examined on January 30, 2010, by an unspecified medical professional. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 19; Doctor Defs.' Reply Ex. 5. The same person examined King's knee again on February 13, 2010. At the second appointment, King complained that he was unable to climb stairs. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 19; Doctor Defs.' Reply Ex. 5.

Dr. Ghosh examined King's knee on April 13, 2010. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 25; Wexford Defs.' LR 56.1(a)(3) Stmt. ¶ 15. Dr. Ghosh recommended that King undergo an MRI. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 25; Wexford Defs.' LR 56.1(a)(3) Stmt. ¶ 15.

King underwent an MRI at UIC on June 8, 2010, and Dr. Ghosh met with him to discuss the results on June 9, 2010. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 26. The MRI results revealed a "[h]orizontal cleavage tear of the posterior horn and body segment of the medial meniscus," as well as "mild, likely chronic, distal ACL sprain with small paracruciate cysts." *Id.*; Doctor Defs.' Ex. M, at 9. In plainer language, King had a torn meniscus and a sprained ACL.

Dr. Schaefer examined King on August 17, 2010, but the examination was limited to King's hernia. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 27. Dr. Schaefer did not examine his knee on that date, and King does not assert that he asked Dr. Schaefer to examine his knee. Pl.'s LR 56.1(b)(3)(B) Stmt. (Doctor Defs.) ¶ 27. *See generally* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 1–40.

On September 1, 2010, Williams examined King's knee. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 28. She told King that Dr. Ghosh had approved an orthopedic evaluation of King's knee at UIC. *Id.* On November 1, 2010, Dr. Chmell, an orthopedic surgeon at UIC, evaluated King's knee, reviewed the MRI results, and recommended arthroscopic knee surgery. *Id.* ¶ 29. After returning to Stateville, on November 5, 2010, King refused his Tramadol and Neurontin pain medication. Wexford Defs.' LR 56.1(a)(3) Stmt. ¶ 20.[6] Three days later, he again refused to take his medications. *Id.* at ¶ 21.

Dr. Chmell performed a right knee arthroscopy, diagnostic scope, and partial medial meniscectomy without complication on November 16, 2010. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 30. After the surgery, King was admitted into Stateville's infirmary, where he received narcotic-strength pain medication for three days. *Id.*; Pl.'s Dep. Pt. 1, at 53. On November 18, 2010, King was discharged to his cell with crutches and a medical permit for a low bunk and low gallery floor of the prison. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 30.

King returned to UIC on November 22, 2010, for a post-operative evaluation with Dr. Chmell. *Id.* ¶ 31. Dr. Chmell stated that King had been given a prescription for Celebrex. Doctor Defs.' Ex. M, at 29. Dr. Chmell also prescribed physical therapy to improve King's range of motion and to prevent stiffness in his right knee. *Id.* The parties dispute whether Dr. Ghosh disregarded Dr. Chmell's prescribed course of treatment for the following two months. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 31; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 25; Doctor Defs.' Resp. Pl.'s LR

---

[6]     Although King tries to dispute that he refused pain medication while at Stateville on November 5, 2010, his response does not constitute a denial. He merely states that the Neurontin was ineffective and ultimately discontinued by UIC medical staff, *see* Pl.'s LR 56.1(b)(3)(B) Stmt. (Wexford) ¶ 20, which does not refute the fact that he refused to take both medications while at Stateville. Accordingly, this fact is deemed admitted. The fact that King refused medication again on November 8, 2010, is also deemed admitted because King did not support his denial with a citation to the record, as he was required to do. *See id.* ¶ 21.

13

56.1(b)(3)(C) Stmt. ¶ 25; Pl.'s Dep. Pt. 1, at 53, 55. King contends, and Defendants dispute, that Dr. Ghosh's flouting of Dr. Chmell's prescribed treatment resulted in King's uncontrolled knee pain for two months and his reliance on crutches to this day. *See* Doctor Defs.' Resp. Pl.'s LR 56.1(b)(3)C) Stmt. ¶¶ 16, 18.

Almost two years after King's arthroscopic surgery, King again complained of right knee pain. Dr. Obaisi, who was Medical Director at the time, referred King for six months of physical therapy from February to August 2013. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 57. On November 14, 2013, Dr. Obaisi examined his knee, which was "free from swelling and tenderness." *Id.* ¶ 59. He administered an injection of Toradol for King's TMJ, hernia, and knee pain and refilled his prescription for Celebrex pain medication. *Id.* Although King says he did not receive that medication afterward, or for that matter, at any time during 2013, he admits receiving Mobic, an NSAID, beginning in January 2014. *Id.* ¶¶ 59–60; *see* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 36. Then, in May 2014, Dr. Obaisi again referred King for physical therapy from May to June 2014. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶¶ 65–66. At the end of that therapy session, the physical therapist concluded that King was unlikely to benefit from future physical therapy. *Id.* ¶ 66.

Dr. Obaisi evaluated King's knee again on November 19, 2014, at which time he prescribed a narcotic pain medication and referred him for an orthopedic consultation at UIC. *Id.* ¶ 68. On January 12, 2015, Dr. Rick Wang, an orthopedic surgeon at UIC, observed that King's knee had full range of motion and no swelling. *Id.* ¶ 69. Dr. Wang administered a Cortisone shot and recommended the continuation of NSAIDs and physical therapy. *Id.* Days later, Dr. Obaisi confirmed that King had a current prescription for NSAIDs and referred King to physical therapy. *Id.* After King completed a course of physical therapy in April 2015, the physical therapist noted that, although King had performed at a high level, he still complained of pain. *Id.* ¶ 71.

At the direction and approval of Dr. Obaisi, King was evaluated by Dr. Chmell at UIC on July 6, 2015, as a follow-up to Dr. Wang's evaluation. *Id.* ¶ 72. Dr. Chmell ordered another x-ray, and the results revealed "moderate to severe degenerative arthritis . . . increased since previous exam." *Id.* Based on the x-ray results and the fact that conservative treatment had failed, Dr. Chmell recommended a total right knee arthroplasty, which involves replacing the knee joint with a prosthesis. *Id.* Two days later, Dr. Obaisi approved the surgery, and on November 5, 2015, Dr. Chmell performed the surgery. Doctor Defs.' Ex. M, at 171.

On November 8, 2015, King was discharged from UIC and returned to Stateville, where he forwent being admitted into the infirmary. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 74. On November 12, 2015, Dr. Obaisi prescribed Neurontin, a pain medication, provided King with a permit to receive meals in his cell, and referred him immediately to physical therapy, which he attended twice a week for several months. *Id.* ¶ 75.

Based on Dr. Obaisi's approval, King was examined by Dr. Chmell for a post-surgery evaluation on February 8, 2016. *Id.* ¶ 79. Dr. Chmell's impression was that King was "overall doing okay." Doctor Defs.' Ex. M, at 200. Dr. Chmell noted that his range of motion was 0 to 100, and that King had no significant pain or swelling. *Id.* at 201. Dr. Chmell recommended physical therapy, which was approved by Dr. Obaisi. *Id.* at 202.

### III. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court gives "the non-moving party the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013). In order to survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmovant "must establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## IV. Analysis

Section 1983 provides a private right of action against persons acting under color of state law who violate constitutional rights. 42 U.S.C. § 1983. The Eighth Amendment, applied to the states through the Fourteenth Amendment's Due Process Clause, prohibits cruel and unusual punishment. *Gillis v. Litscher*, 468 F.3d 488, 491 (7th Cir. 2006). Cruel and unusual punishment includes deliberate indifference to the serious medical needs of prisoners. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Delaying treatment of a non-life-threatening—but painful—condition for nonmedical reasons may constitute deliberate indifference. *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). This is true even if the delay in treating does not exacerbate the injury. *Smith v. Knox Cty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012).[7]

---

[7] As an initial matter, the Doctor Defendants as well as Sheehy and Thompson, the medical technicians, argue that they are entitled to qualified immunity. Public-employee prison employees are protected by qualified immunity. *Procunier v. Navarette*, 434 U.S. 555, 561 (1978). Prison correctional officers and health care workers employed by private corporations, however, are not. *See Richardson v. McKnight*, 521 U.S. 399, 412 (1997) (correctional officers employed by private corporation); *Rasho v. Elyea*, ___ F.3d ____, No. 14-1902, 2017 WL 892500, at *7 (7th Cir. Mar. 7, 2017) (Wexford employees).

Drs. Funk, Davis, Obaisi, and Zhang admit that they are employees by Wexford. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 5 (Dr. Funk); Answer ¶ 9, ECF No. 9 (Drs. Davis and Obaisi); Answer ¶ 8, ECF No. 249 (Dr. Zhang). As employees of Wexford, Drs. Funk, Davis, Obaisi, and Zhang are not entitled to qualified immunity.

None of the other doctors or the medical technicians has stated whether IDOC employs him or her. At most, each has asserted that he or she worked *at* Stateville. *See* IDOC Defs.' LR 56.1(a)(3) Stmt. ¶¶ 7, 8; Doctor Defs.' LR 56.1(a)(3) Stmt. ¶¶ 2–4, 6–8; Wexford Defs.' LR 56.1(a)(3) Stmt. ¶ 4. Merely stating that a person works *at* a particular prison location does not establish that the person is *employed by a public entity*. As a result, these Defendants have not met their burden to show that they are public employees, and the Court is unable to determine on this record whether they are entitled to qualified immunity.

"A plaintiff claiming a constitutional violation under § 1983 for denial of medical care must meet both an objective and subjective component." *Pittman ex rel. Hamilton v. Cty. of Madison*, 746 F.3d 766, 775 (7th Cir. 2014). First, he must show that his medical need is objectively serious. *Id.* Second, "the plaintiff must show that the defendant[s] . . . had a sufficiently culpable state of mind—that their acts or omissions [were] sufficiently harmful to evidence deliberate indifference to his serious medical needs." *Id.* at 775–76 (internal quotation marks omitted).

### A.    Dr. Carter: Statute of Limitations

Dr. Carter correctly argues that the claims against him are time-barred. Illinois's two-year statute of limitations applies to § 1983 claims. *Rosado v. Gonzalez*, 832 F.3d 714, 716 (7th Cir. 2016). It is undisputed that Dr. Carter was no longer employed at Stateville after May 13, 2012. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 6. King first added Dr. Carter as a Defendant in his Fourth Amended Complaint on June 6, 2014, after the two-year statute of limitations had expired. 4th Am. Compl., ECF No. 239. Accordingly, the Court grants summary judgment in Dr. Carter's favor as to all claims.

### B.    Medical Technicians and Other Doctors

King claims that medical technicians Sheehy and Thompson, as well as Drs. Bautista, Davis, Funk, Ghosh, Obaisi, Schaefer, and Zhang, were deliberately indifferent to his hernia and knee. The Court addresses each in turn.

### 1.    King's Inguinal Hernia Pre-Surgery

The Seventh Circuit has recognized that a hernia can be an objectively serious medical condition and that chronic pain alone is a separate, objectively serious condition. *Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011). Furthermore, the court has noted:

According to the National Institutes of Health, "surgery will usually be used for hernias that are getting larger or are painful" and is the only treatment that can permanently fix a hernia. *See* Medline Plus, *Hernia*, http://www.nlm.nih.gov/medlineplus/ency/article/000960.htm (last visited Nov. 29, 2011) . . . . While surgery can be postponed, delay is recommended only for patients with minimal or no symptoms, and then only if the hernia can be reduced readily and completely and will remain in position despite physical activity.

*Id.* at 315 (internal quotation marks and citations omitted). In this case, Defendants apparently concede that, prior to surgery, King's hernia as well as his hernia-related pain were objectively serious. *See generally* Defs.' Mems. Supp. Summ. J., ECF Nos. 334, 335, 336. But they dispute whether their response to his hernia rose to the level of deliberate indifference.

"To determine if a prison official acted with deliberate indifference, we look into his or her subjective state of mind." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). To be liable, the official must have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and must also have actually drawn that inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Even where a defendant denies having been aware of a substantial risk of serious harm, however, summary judgment is inappropriate when a reasonable jury could conclude from other evidence that this was not so. *See Petties*, 836 F.3d at 726 (reversing district court's grant of summary judgment to defendant doctors who denied knowing that failure to immobilize plaintiff's ruptured Achilles tendon exacerbated the injury). The decision to persist in a course of treatment known to be ineffective—when reasonable alternatives are available—constitutes deliberate indifference. *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005); *Garvin v Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001). "[W]here evidence exists that the defendants knew better than to make the medical decisions that they did, a jury should decide whether or not the defendants were actually ignorant to risk of the harm that they caused." *Petties*, 836 F.3d at 731.

As an initial matter, King has not established that Dr. Bautista had anything to do with his pre- or post-surgery treatment. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 36; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 12. *See generally* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 1–40. Accordingly, the Court grants summary judgment in Dr. Bautista's favor as to his claim based on his hernia condition.

With regard to medical technicians Sheehy and Thompson, as well as Drs. Funk, Ghosh, Obaisi, Schaefer, and Zhang, however, King has created a triable issue as to whether they were deliberately indifferent to his hernia and related pain prior to surgery.[8] The Court addresses the medical technicians and doctors in turn.

Sheehy and Thompson, in effect, acted as gatekeepers regarding whether an inmate was seen by medical professionals in the health care unit. Although Sheehy and Thompson state that their general practice was to schedule an inmate complaining of a non-emergency health condition for the first available appointment on the sick call in the health care unit, they do not states whether that practice was likely followed with regard to King. IDOC Defs.' Ex. G, Sheehy Aff. ¶ 4; *see id.*, Ex. F, Thompson Aff. ¶ 4. What is more, King states that, despite asking Sheehy and Thompson on numerous occasions during a five-month period to be placed on the sick-call list for his painful hernia, he was never seen during that entire period. Pl.'s Ex. R, 8/20/08 Grievance. A reasonable jury could infer from these facts that Sheehy and Thompson had not adhered to their general practice in King's case. King has thus created a triable issue regarding Sheehy and Thomson's deliberate indifference to his painful hernia.

A reasonable jury could also find that Drs. Funk, Ghosh, Obaisi, Schaefer, and Zhang were deliberately indifferent to King's hernia and pain prior to surgery. King asserts that Dr. Aguinaldo had diagnosed his non-reducible inguinal hernia in January 2008. *See* Pl.'s Dep. Pt. 3, at 55; Pl.'s

---

[8]    Because Dr. Davis only treated King's hernia well after his surgery, King has not established a genuine issue of fact as to her deliberate indifference prior to surgery.

Ex. Q. At that time, Dr. Aguinaldo had recommended that Dr. Ghosh refer King to UIC for surgical evaluation, which is in line with Wexford's position that non-reducible hernias require surgical intervention. *See* Wexford Defs.' LR 56.1(a)(3) Stmt. ¶ 48. A jury could therefore reasonably infer from the facts in the record that King's hernia was non-reducible and required surgical intervention in 2008, thereby calling into question how any of the doctors could subsequently conclude that King's hernia was reducible and did not require surgical intervention. *See, e.g.*, Pl.'s LR 56.1(b)(3)(B) Stmt. (Doctor Defs.) ¶ 36 (Funk); *id.* ¶ 25 (Ghosh); *id.* ¶¶ 45–49 (Obaisi); *id.* ¶ 27 (Schaefer); *id.* ¶ 22 (Zhang); Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 3, 6, 8, 33, 36, 38; Pl.'s Ex. Q; Pl.'s Dep. Pt. 3, at 55–56; Doctor Defs.' Reply Ex. 2; *see also* Pl.'s Ex. R, 8/20/08 Grievance; Pl.'s Ex. S, 1/7/09 Grievance; Pl.'s Ex. U, 2/4/10 Grievance; Pl.'s Ex. W, 4/8/10 Grievance.

Moreover, the record contains evidence that King's hernia pain interfered with his daily life activities, such as walking and sitting. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 8 (unable to walk due to hernia); Pl.'s Ex. S, 1/7/09 Grievance (with hernia, it "hurts to walk and sit down"). Yet, rather than seeking approval of surgical intervention, the doctors persisted for nearly *five* years in prescribing ineffective pain medications or treatment that never was actually administered, such as a scrotal ultrasound. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 5, 6, 8, 9, 13–14, 16, 33, 38. The Court therefore denies Defendants Sheehy, Thompson, Funk, Ghosh, Obaisi, Schaefer, and Zhang's motion for summary judgment as to King's Eighth Amendment claim based on his hernia and pain prior to surgery.

### 2. King's Inguinal Hernia Site Post-Surgery

King further claims that Defendants were deliberately indifferent to the pain he felt around the hernia surgical site *after* surgery. Although King generally states that he has received only intermittent and ineffective medication for this pain and has filed five grievances about it, he does

not provide the grievances themselves or describe any particular instance of deliberate indifference to support this claim. *Id.* ¶¶ 16, 33, 38; *see* Pl.'s Exs. (omitting grievances after 2010); *see* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 1–40. Furthermore, the only evidence in the record with regard to this pain is limited to Dr. Davis and Dr. Obaisi's treatment. The facts surrounding their response to King's pain fail to create a reasonable inference that it was an objectively serious medical condition or that their treatment rose to the level of an Eighth Amendment violation.

First, Dr. Davis examined King only on July 2, 2013. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 58. Dr. Davis noted that King felt tenderness in the area, but she did not see any fascial defect or feel a recurring hernia upon palpation. *Id.*; Doctor Defs.' Ex. M, at 134. Dr. Davis diagnosed King's pain as being muscle-related, prescribed analgesic balm to rub on the area, and told King to follow up as scheduled with Medical Director Dr. Obaisi. Doctor Defs.' Ex. M, at 134. Given these facts, no reasonable jury could find that King's surgical-site pain was an objectively serious medical condition or that Dr. Davis's response to the pain constituted deliberate indifference. *See Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) ("An objectively serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention.").

Second, Dr. Obaisi examined the area around King's hernia scar on November 14, 2013, and it did not show any abnormalities. Doctor Defs.' Ex. G, Obaisi Decl. ¶ 21 (cited in Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 59). But because King was complaining of pain due to his hernia scar area, as well as his knee and TMJ, Dr. Obaisi administered an injection of Toradol, a pain medication. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 59. When King again complained about this pain on March 17, 2014, Dr. Obaisi examined his hernia repair site and noted that his inguinal canal was within normal limits and there were no signs that the hernia had recurred. *Id.* ¶ 64. In short, Dr. Obaisi attempted to, but could not, determine the cause of King's pain around his hernia

scar.  Nonetheless, Dr. Obaisi renewed King's prescription for pain medications and directed him to follow up as needed.  *Id.*  Based on this evidence, no reasonable jury could find King's hernia site pain was an objectively serious medical condition or that Dr. Obaisi's response to King's complaints of pain rose to the level of deliberate indifference.

These are the only incidents relating to treatment of King's surgical-site pain in the summary judgment record, and they do not create a reasonable inference of an objectively serious medical condition or a conscious disregard of that need.  Accordingly, the Court grants summary judgment in favor of all Defendants with regard to King's Eighth Amendment claim based on his surgical-site pain.

### 3.      King's Knee Condition

King also claims that the doctors and medical technicians were deliberately indifferent to his knee condition.  As with his hernia condition prior to surgery, Defendants concede that King's knee condition prior to both surgeries constituted a serious medical need.  They argue, however, that King has not created an issue for trial regarding the subjective element of his deliberate indifference claim.  To satisfy this element, an inmate must show that the defendants were aware of his serious medical needs and consciously disregarded a significant risk to his health or safety. *Grieveson v. Anderson*, 538 F.3d 763, 775 (7th Cir. 2008).  A showing of a defendant's mere negligence or inadvertence is insufficient.  *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011).  With the exception of Dr. Ghosh, Defendants are correct.  The Court addresses the exception first.

For starters, it is clear that no jury could reasonably conclude that Dr. Ghosh was deliberately indifferent to King's knee condition *prior to* King's first knee surgery.  At Dr. Ghosh's direction and approval, King had undergone an MRI, seen an orthopedic surgeon, and obtained arthroscopic surgery at UIC within seven months of Dr. Ghosh's first examination of

King's knee.  Doctor Defs.' LR 56.1(a)(3) Stmt. ¶¶ 25–30; Wexford Defs.' LR 56.1(a)(3) Stmt. ¶ 15.

Dr. Ghosh's post-operative care of King's knee condition, however, is another matter. Viewing the summary judgment record in the light most favorable to King, a jury could find that Dr. Ghosh disregarded the orthopedic surgeon's post-operative prescription of Celebrex pain medication and physical therapy for two months for no apparent reason.  *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 25, 31; Pl.'s LR 56.1(b)(3)(B) Stmt. (Doctor Defs.) ¶ 31; *see* Pl.'s Ex. BB, 11/22/10 UIC Medical Record (prescribing Celebrex and physical therapy); Pl.'s Dep. Pt. 3, at 52; Pl.'s Dep. Pt. 1, at 51–53.  It is true that "a difference of opinion among physicians on how an inmate should be treated cannot support a finding of deliberate indifference." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006).  In this case, however, Dr. Ghosh does not assert that he disagreed in any way with the orthopedic surgeon's prescribed course of treatment or that he had any medical basis for the two-month delay.  Accordingly, a jury could reasonably infer that Dr. Ghosh was deliberately indifferent to King's knee condition post-surgery.  *See Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011) ("[R]efusal to provide an inmate with prescribed medication or to follow the advice of a specialist can . . . state an Eighth Amendment claim.").

That said, the Court grants summary judgment in favor of the medical technicians and the other physicians with respect to King's knee condition.  As for the medical technicians, King has not established a genuine issue as to whether Sheehy or Thompson was deliberately indifferent to his knee condition.  As a threshold issue, King has not sued Thompson for deliberate indifference in this regard.  *See* 4th Am. Compl., Count II.  His claim against Sheehy also falters because it is solely based on a list of dates on which King filed grievances.  Although King provides the dates on which he filed grievances purportedly regarding his knee condition, he does not include any of the listed grievances as exhibits or otherwise describe the listed grievances.  *See* Pl.'s LR

56.1(b)(3)(C) Stmt. ¶ 34. He has therefore failed to establish that Sheehy was the subject of any of the grievances filed on those dates. The Court thus grants summary judgment as to Sheehy and Thompson on King's Eighth Amendment claim based on his knee condition.

Turning to the doctors, King admits he has no claim against Dr. Funk regarding his knee. *See* Pl.'s Dep. Pt. 3, at 22. Accordingly, the Court grants summary judgment in Dr. Funk's favor as to this claim.

Next, no jury could find that Dr. Zhang's treatment of King's knee constituted deliberate indifference. Dr. Zhang examined his knee on a single occasion on October 18, 2008. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 21. At that point, an x-ray showed minimal early degenerative joint disease for which King had been prescribed an NSAID, an analgesic balm, and a knee brace. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 19; Doctor Defs.' Ex. M, at 3. Dr. Zhang noted that King's knee showed full range of motion and that he was able to bear weight on his right leg. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 21. Given these facts, no reasonable jury could conclude that Dr. Zhang's decision to continue King's course of treatment constituted deliberate indifference to King's knee condition. *See id.* Although King asserts that the pain medication had been ineffective, *see* Pl.'s LR 56.1(b)(3)(B) Stmt. (Doctor Defs.) ¶ 21, there is no evidence suggesting that King ever communicated that fact to Dr. Zhang. Accordingly, the Court grants Dr. Zhang's motion for summary judgment on this claim.

Furthermore, King has not created a factual issue as to whether Drs. Bautista, Davis, and Schaefer were deliberately indifferent to his knee condition. First, King agrees that on the one occasion that Dr. Bautista treated his knee, he approved King's request to refill his medications, including Celebrex, for his knee pain. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶ 35. Dr. Bautista also obtained Wexford's approval of an orthopedic evaluation of his knee at UIC. *Id.* ¶ 37. Second, King also agrees that, on the one occasion he was examined by Dr. Davis, she scheduled a follow-

24

up appointment for him to see the Medical Director. *Id.* ¶ 62. Third, it is undisputed that Dr. Schaefer's sole examination of King related to his hernia, not his knee. *Id.* ¶ 27. Moreover, King has omitted any facts about Drs. Bautista, Davis, and Schaefer's treatment of his knee from his statement of additional facts. *See generally* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 1–40. Based on the paucity of facts in the record regarding these doctors' treatment of King's knee, no reasonable jury could find in King's favor. The Court therefore grants summary judgment in favor of Drs. Bautista, Davis, and Schaefer as to King's claim based on his knee condition.

In addition, the Court concludes that there is no disputed issue of material fact regarding whether Dr. Obaisi was deliberately indifferent to King's knee condition. Two years after King's arthroscopic surgery, when Dr. Obaisi was the Medical Director, King complained of right knee pain. Dr. Obaisi treated King's condition with NSAIDs and two rounds of physical therapy. Doctor Defs.' LR 56.1(a)(3) Stmt. ¶¶ 57, 59–60, 65–66; *see* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 36. And when the physical therapist indicated that King was unlikely to benefit from future physical therapy, Dr. Obaisi sought an orthopedic surgeon's opinion. *Id.* ¶¶ 66, 68. Dr. Wang, the orthopedic surgeon, however, recommended that King continue the course of treatment of NSAIDs and physical therapy, and Dr. Obaisi then followed Dr. Wang's advice. *Id.* ¶ 69. When it became clear that neither of the methods that Dr. Wang had recommended had improved King's knee condition, Dr. Obaisi again sought the guidance of an orthopedic surgeon, Dr. Chmell. *Id.* ¶¶ 71–72. Because the x-ray showed that the condition of King's knee joint had deteriorated dramatically since Dr. Wang's evaluation, Dr. Chmell recommended surgery, which Dr. Obaisi quickly approved. *Id.* ¶ 72; Doctor Defs.' Ex. M, at 171. On the heels of King's surgery, Dr. Obaisi prescribed pain medication and referred him for physical therapy. *Id.* ¶ 75. Three months after the surgery, Dr. Obaisi directed that King be evaluated by Dr. Chmell, who noted that King moved his knee without significant pain or swelling and who recommended physical therapy,

which Dr. Obaisi approved. *Id.* ¶ 79. All in all, Dr. Obaisi's response to King's knee condition shows a conservative, yet progressive, method of treatment. Viewing all of the disputed and undisputed facts in King's favor, the Court grants Dr. Obaisi's summary judgment motion as to this claim.

The Court therefore grants summary judgment on this claim in favor of Defendants Sheehy, Thompson, Bautista, Davis, Funk, Obaisi, Schaefer, and Zhang. The Court grants summary judgment in Dr. Ghosh's favor with regard to his treatment of King's knee prior to surgery and denies summary judgment with regard to Dr. Ghosh's post-operative care of King's knee.

### C. Wexford Health Sources, Inc.

Next, Wexford has moved for summary judgment as to all claims. "To recover against Wexford . . . [a plaintiff] must offer evidence that his injury was caused by a Wexford policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy." *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 796 (7th Cir. 2014) (citing *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004)). "[I]solated incidents do not add up to a pattern of behavior that would support an inference of a custom or policy, as required to find that Wexford as an institution/corporation was deliberately indifferent to [a plaintiff's] needs." *Id.*

King's claim against Wexford is limited to one unwritten policy. King states that he "has often been forced to choose between treatments of issues during medical evaluations, being told that a 'one issue at a time' policy precluded having all of his issues treated in a single appointment." Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 35. In support of this assertion, King cites his own declaration, which simply echoes this exact statement. Pl.'s Reply Ex., Pl.'s Decl. ¶ 35.

To fend off Wexford's summary judgment motion, it is King's burden to create an inference that the unwritten policy existed and that it caused him injury. King supports this claim by arguing that Dr. Carter told him on August 18, 2011, that the medical staff had a "one issue at a time" policy. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. (Doctor Defs.) ¶ 39. King's reliance on a single incident is insufficient to sustain his burden of establishing a pattern of behavior. Furthermore, that same day, Dr. Carter examined King's knee condition, ulcer condition, and TMJ condition during the same appointment. Doctor Defs.' Ex. M, at 66.

Additionally, King has not established that he was harmed by the purported policy. King does not argue that he could not have scheduled another appointment to address other medical conditions. Nor does he argue that he was somehow injured by having to make multiple appointments. Having failed to create a triable issue of fact regarding his claim against Wexford, the Court grants Wexford's summary judgment motion.

**D.      Defendants Shannis Stock and Salvador Godinez**

Finally, Shannis Stock, IDOC Chief of Programs and Support Services, and Salvador Godinez, IDOC's Director, who have been sued in their official capacity, have moved for summary judgment as to any and all claims against them. A suit against state officers in their official capacity is, in effect, a suit against the state. *Hafer v. Melo*, 502 U.S. 21, 25 (1991).

Shannis and Godinez argue that King is precluded from seeking compensatory or punitive damages from them. They are correct. The Eleventh Amendment bars damages actions against state officers. *Kentucky v. Graham*, 473 U.S. 159, 169–70 (1985); *Parker v. Lyons*, 757 F.3d 701, 706 (7th Cir. 2014).

The Eleventh Amendment, however, does not bar King's request for injunctive relief against Stock and Godinez in their official capacity. *See Ex Parte Young*, 209 U.S. 123, 159–60 (1908). Nevertheless, summary judgment is appropriate here, because "in an official-capacity suit

the entity's 'policy or custom' must have played a part in the violation of federal law." *Graham*, 473 U.S. at 166. As mentioned above, King claims that, during examinations by medical staff, there was a "one issue at a time" policy that precluded his issues from all being treated in a single appointment. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 35. King agrees that Wexford is contracted to provide medical services to inmates at Stateville. Pl.'s LR 56.1(b)(3)(B) Stmt. (Wexford) ¶ 54. Because the only alleged policy at issue is Wexford's, not IDOC's, the Court grants Stock and Godinez's summary judgment motion with regard to King's request for injunctive relief.

## V. Conclusion

For the reasons stated herein, the Court grants in part and denies in part Defendants' motions for summary judgment [333] [335] [344]. Summary judgment is granted as to Defendants Bautista, Carter, and Davis, in their individual and official capacities, as well as Shannis Stock, S.A. Godinez, and Wexford Health Source, Inc., and they are dismissed as Defendants. The motions are denied as to Defendants Funk, Ghosh, Obaisi, Schaefer, Sheehy, Thomas, and Zhang with regard to King's deliberate indifference claim based on his hernia and hernia pain prior to surgery, but the motions are granted as to his claim against all Defendants based on the pain around his hernia surgical site well after surgery. The motions are granted as to Defendants Funk, Obaisi, Schaefer, Sheehy, Thomas, and Zhang with regard to King's deliberate indifference claim based on his knee condition. Summary judgment is granted as to Defendant Ghosh with regard to his pre-surgery treatment of King's knee condition but denied as to Dr. Ghosh's post-operative care of King's knee.

A status hearing will be held on April 13, 2017, at 9:00 a.m.  The parties should be prepared to set deadlines for pretrial filings and a date for the final pretrial conference and trial.


**IT IS SO ORDERED.**               **ENTERED   3/28/17**

_____
**John Z. Lee**
**United States District Judge**